# Whiteleaf Steamship Company, Limited, *v.* Henry C. Ayer and Robert H. Foerderer, Appellants.

*Ships and shipping—Charter party—Principal and surety.*

A charter party provided that in default of payment of the monthly hire, " the owners shall have faculty of withdrawing the said steamer from the service of the charterers without prejudice to any claim they, the owners, may otherwise have on the charterers, in pursuance of this charter." Two months before the end of the term the owners took possession of the vessel for failure to pay the hire then due. *Held,* that the owners could recover from the persons who had become sureties for the hire the subsequently accruing hire up to the expiration of the charter party, less such sum as the owners received for the use of the vessel after they had taken possession of it.

Argued Jan. 13, 1898. Appeal, No. 275, Jan. T., 1897, by defendants, from order of C. P. No. 1, Phila. County, June Term, 1893, No. 786, dismissing exceptions to report of referee. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Assumpsit to recover hire under a charter party.

The material portions of the charter party were as follows :

" 4. Payment of said hire to be made in cash at New York, two months in advance, on delivery of the steamer, and one month's hire at the expiration of the first and each subsequent month (so that the hire shall always have been paid two months in advance at the expiration of each month), until the expiry of the eleventh month; and in default of such payment the owners shall have faculty of withdrawing the said steamer from the service of the charterers without prejudice to any claim they, the owners, may otherwise have on the charterers in pursuance of this charter.

" 5. That should the steamer be on her voyage toward the port of return delivery at the time a payment of hire comes due, said payment shall be made for such a length of time as owner's agents and charterers or their agents may agree upon as the estimated time necessary to complete the voyage ; and when the steamer is redelivered to owner's agents any difference shall be

refunded by owners or paid by charterers, as the case may require."

Indorsed upon the charter party was the following:

"For and in consideration of the execution of the within Charter Party by John White, Agent and Manager for the owners of. the Steamship Mandarin, we jointly and severally agree with the said owners that Henry C. Ayer is president of the said Mexican International Steamship Company, and authorized by its charter, by-laws and board of directors to execute the same and bind the said company to the faithful performance of all the covenants, terms and conditions therein, and in further consideration of the said execution, we jointly and severally guaranty to said owners the faithful performance of the said covenants, terms and conditions on the part of the said Steamship Company, and in default thereof, promise to pay the said owners their damages to the extent of but not exceeding ten thousand dollars ($10,000). Time may be given for payment of the hire provided for in said charter or variation made by the parties in the said covenants, terms and conditions, without affecting our liability hereunder and without notice to us.

"Witness our hands this 23d day of April, 1892.

"HENRY C. AYER,
"ROBERT H. FOERDERER,
"BENJAMIN F. TAYLOR."

The case was referred to Henry R. Edmunds, Esq., who reported as follows:

### FINDINGS OF FACT.

1. The plaintiff is the owner of the British steamship Mandarin, and on April 6, A. D. 1892, a charter party was executed by and between the plaintiff and the Mexican International Steamship Company, hereinafter called the Mexican Company, by which said Mexican Company chartered said vessel for the term of twelve calendar months from the day she was placed at the disposal of the charterers, at the rate of $4,600 per month.

2. Upon said original charter party an agreement in writing, dated April 23, 1892, was indorsed, of which the following is a copy:

"The act of God, perils of the sea, fire on board, in hulk, or

craft, or on shore, barratry of the master and crew, enemies, pirates and thieves, arrests, and restraints of princes, rulers and people, collisions, stranding and other accidents of navigation excepted, even when occasioned by negligence, default or error in judgment of the pilot, master, mariners or other servants of the ship-owners. Not answerable for any loss or damage arising from explosion, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull, not resulting from want of due diligence by the owners of the ship or any of them, or by the ship's husband or manager. The ship has liberty to call at any ports in any order, to sail without pilots, to tow and assist vessels in distress, and to deviate for the purpose of saving life and property."

3. The said British steamship Mandarin was a new vessel, having set out upon her first voyage on November 24, 1891, and was built for the African trade. She had made a trial trip, upon which she had steamed at the speed of eleven knots per hour on a consumption of coal of fifteen tons per day. She had not completed any voyage prior to the execution of said charter party, and at the time of the execution thereof was at sea on her first regular voyage. It is stated in the charter party that at the date thereof she was in a port of Brazil or on a voyage to the United States.

4. That said Mexican Company was a corporation lately organized, engaged in trading between the city of Philadelphia and ports in the West Indies and Mexico, with vessels chartered by them for their said trade. Said Mexican Company, in some way not shown by the testimony, had obtained information as to the general character, capacity, etc., of the steamship Mandarin, and had stated to one Frederick R. Rohl, who was employed by the shipping firm of J. M. Ceballos & Co., of New York City, as the manager of their steamship department, their desire to charter the Mandarin for their business. Said Rohl acting for said firm of J. M. Ceballos & Co., and which firm had chartered other vessels for the said Mexican Company, succeeded in introducing John White, of London, manager of the company plaintiff to Henry C. Ayer, one of the defendants, president of said Mexican Company. Prior to the time when the said firm of J. M. Ceballos & Co., which was acting through said Rohl for the said Mexican Company in chartering vessels for it, brought

said White and said Ayer together, neither plaintiff nor said White was acquainted with or had any business relations with said Mexican Company or with said Rohl, or with said J. M. Ceballos & Co.

5. There was but one meeting, and that early in April, 1892, between White, manager of. the company plaintiff, and Ayer, president of the Mexican Company, at which meeting said White exhibited the log of the trial trip of the Mandarin, and the plan of the vessel and the details of her construction and capacity, which plan and details, as above stated, had prior to said meeting been in the possession of the Mexican Company. At this meeting said White refused to guarantee either the speed of the Mandarin or her consumption of coal. The directors of the Mexican Company expressed themselves well pleased with the plan and description of the Mandarin, and after above interview negotiations conducted through said firm of J. M. Ceballos & Co., acting by said Rohl, resulted in the execution of the charter party, and the agreement of the defendants sued on in this case.

6. The steamship Mandarin was delivered to and accepted by the Mexican Company on May 19, 1892, in accordance with the terms of said charter party, and remained in the possession and service of the said Mexican Company under said charter party until February 21, 1893. Two months' hire of the steamship was paid in advance, and from time to time thereafter the monthly hire for eight additional months was paid by the Mexican Company after adjustment and allowance of small claims by both parties. The hire for the month beginning January 19, 1893, and for the month beginning February 19, 1893, was not paid. The failure to make said last two mentioned payments was due to the fact that said Mexican Company had become insolvent, and was no longer able to continue its business. The insolvency of said Mexican Company was admitted at the hearing before the referee. After the insolvency of said Mexican Company the defendants in this case and their cosurety, Benjamin F. Taylor, took possession of the vessel, and did succeed in obtaining some employment for her and in collecting certain money for her hire ; but, failing to find steady employment for her, counsel for the said Mexican Company and said defendants and said Taylor notified the plaintiff that no further hire would

be paid, and said Mexican Company and defendants endeavored through their counsel to compromise with the plaintiff the liability incurred under the charter and upon the agreement sued upon in this action.    Efforts to compromise proved unsuccessful and the steamship was given up by the charterers and said defendants and said Taylor and allowed to lie idle in the port of New York for about eleven days.    And thereupon a notice, of which the following is a copy, was served upon the said Mexican Company and the defendants in this action and said Benjamin F. Taylor :

"NEW YORK, Feb. 21, 1893.

"The Mexican International Steamship Co., Philadelphia, Pa.; Henry C. Ayer, Esq., care of Peddrick & Ayer, Philadelphia; Robert H. Foerderer, Esq., Frankford, Philadelphia, Pa.; Benjamin F. Taylor, Esq., care W. D. Munson, 80 Wall Street, N. Y.

"Dear Sirs : Please take notice that default having been made in payment of hire of steamship Mandarin, due the 19th inst., the steamer is hereby withdrawn from the service of the charterers in conformity with the terms of charter party, dated the 6th day of April, 1892, and also that you and each of you will be held liable for the damages that may be suffered from the charterers' breach of contract.

"Very truly yours,
          "WHITELEAF S. S. CO., LIMITED.
          "JOHN WHITE, Manager.
          "By WILCOX, ADAMS & GREEN,
                                   "Attorneys."

And possession of the vessel was taken at New York by the plaintiff on the 21st day of February, 1893.

7. The evidence does not show what use the plaintiff made of this vessel from February 21, 1893, until the expiration of the charter on May 19, 1893, but in the statement of claim the plaintiff has allowed the sum of $3,120, alleging that sum to be the net amount realized by the plaintiff for the use of the vessel on voyages therein named, from February 21, 1893, to May 19, 1893.    And in the statement the plaintiff alleges that the particulars of said credit of $3,120 were furnished to the said Mex

ican Company, and not disputed by it.   There is no evidence
that any greater net sum than above $3,120 was earned, or
could have been earned by the vessel during said period, viz:
from February 21, 1893, to May 19, 1893, and no witness for
either party has testified in respect to the employment or earn-
ings of said vessel after the plaintiff took possession of her on
February 21, 1883.

8. The allegations made in the affidavit of defense, that the
Mexican Company was induced to sign said charter party by
false representations made by said Rohl, that the Mandarin
would steam eleven knots per hour on a coal consumption of
fourteen or fifteen tons per day, and that she was the best steam-
ship in the market for the use to which the Mexican Company
intended to put her, and that said false representations were
made with the knowledge of said White and said plaintiffs, are
not sustained by the evidence.   The Mexican Company was
not induced to sign, and did not sign, said charter party by any
false representations of the plaintiff or of White, its manager.
The said firm of J. M. Ceballos & Co., and said Rohl, who was
in the employment of said firm, were the agents of said Mexican
Company in procuring a charter of the Mandarin to said Mexi-
can Company.

9. There is no evidence to show that any coal, the property
of the Mexican Company, was left on board the Mandarin when
the plaintiff took possession of her on February 21, 1893.   The
vessel had but four steam winches, and there is no evidence to
show that the donkey boiler capacity was not sufficient to move
them.

10. It was admitted that the said charter party and the said
agreement indorsed thereon were duly executed, and that before
and at the time the plaintiff took possession of the Mandarin,
on February 21, 1893, the Mexican Company was insolvent.

11. The Mexican Company paid to the plaintiff ten months'
hire of the Mandarin, amounting to $46,000, without making
any complaint as to the speed, consumption of coal, capacity, or
quality of the vessel, or in any other respect, and without mak-
ing any claim for deduction in any sum by reason of any defects
or failures of the vessel, or of the plaintiff in any way to carry
out and fulfil the conditions of the charter party.

12. During the time the Mandarin was in the service of the

Mexican Company, no claim of a warranty on the part of the plaintiff as to the speed of and consumption of coal by the vessel was made to the plaintiff by the Mexican Company, although during said time the logs produced in evidence show that the average speed of the vessel was less than eleven knots per hour, and that her average consumption of coal was from sixteen to seventeen tons per day. It is shown by said logs that in some cases the vessel made more than eleven knots per hour on a coal consumption of sixteen tons per day.

13. During the time that the Mandarin was in the service of the Mexican Company, no complaint was made to the plaintiff by the Mexican Company that any false representation had been made by the plaintiff to the Mexican Company as to the speed, consumption of coal, capacity, passenger accommodation, quality or condition of the vessel, or in any other respect, although the evidence shows that the monthly hire was not always paid when due, and that on several occasions it was paid after the plaintiff had threatened to begin legal proceedings to collect it.

14. It is proved that the speed of the vessel and her consumption of coal depend upon the character and quality of the coal used, and upon the weather, and the trim of the vessel and other causes. No evidence was produced to show the nature of cargo carried by the Mandarin on her different voyages under said charter party while in the control of the charterers, or the character and quality of coal used, nor was any log of the mate or master produced to show the weather, currents, etc., nor was any evidence produced to show that the Mexican Company or the defendants had suffered any loss whatever in their business from any delay by the vessel in making trips between the ports to which she traded.

15. The claim of the plaintiff for the sum of $331.03, for hire of purchase blocks, transporting the ship from pier to pier, and for purchase blocks, etc., was made to the said Mexican Company, but was not paid, and no reply was made to the demands of the plaintiff therefor, and the same is proved to be due by the evidence of John White. Since this action was begun the sum of $65.25, claimed in the statement for deck and engine overtime, has been paid, and the same must be deducted from the amount claimed by the plaintiff. The defendants have not proved that they are entitled to have any deduction or set-off

made from the claim of the plaintiff, as alleged in the affidavit of defense.

16. It is proved that the charter money for two months, viz: $9,200, is due and owing, together with said sum of $331.03, for hire of blocks, etc., making in all the sum of $9,531.03, and from that sum the defendants are entitled to a credit of $3,185.25, composed of the earnings of the vessel after she was given up by the charterers, viz: $3,120, as aforesaid, and said sum of $65.25 for deck and engine overtime as aforesaid, which being deducted leaves a balance due the plaintiff of $6,345.78.

The referee finds and reports the following

### CONCLUSIONS OF LAW.

1. The contract sued upon is one of suretyship.

2. Even if the contract sued upon was a contract of guaranty, inasmuch as the insolvency of the Mexican Company has been admitted, the defendants would be liable in this action.

3. No warranty of speed or coal consumption by the vessel was made by the plaintiff, and on that ground no defense has been proved to the plaintiff's claim.

4. No false representations as to speed of the vessel or coal consumption by it, or in any other respect were made by the plaintiff by which the contract sued upon or the charter party were induced to be made, and the defense, based upon such false representations, is not made out.

5. There is no proof that any material covenant or condition, or that any condition of this contract of charter party was omitted therefrom by fraud, accident or mistake, and the charter party and the agreement indorsed thereon constitute and are the entire contract. And the rights of the parties must be determined solely by the charter party and by the agreement sued upon, and by the occurrences after the execution thereof.

6. The charterers having refused to pay any more hire for the vessel, and having given up the vessel, plaintiff had the right to take possession of the vessel when and as it did, and to use the same, giving credit to the charterers for such net sum as was realized by the use and employment of the vessel from the time the plaintiff took such possession to the day of the expiration of said charter party.

7. By the true construction of the charter party, the plaintiff

was entitled to take possession of the vessel as it did on February 21, 1893, for failure to pay the hire agreed upon, and such act on the part of the plaintiff does not prejudice the plaintiff, or prevent the plaintiff from claiming to recover, and recovering the subsequently accruing hire up to the expiration of the charter party, less such sum as the plaintiff received for the use of the vessel from February 21, 1893, to May 19, 1893.

8. The defendants are not entitled to a certificate in this case against the plaintiff for $4,600, with interest from February 21, 1893, or in any other sum whatever. ·

9. The plaintiff is entitled to recover in this action the unpaid hire of said vessel at the charter rate for two months, to wit : from March 19, 1893, to May 19, 1893, being the sum of $9,200, together with said sum of $331.03 laid out and expended by the plaintiff for the use of the charterers, less the said sum of $3,120, received by the plaintiff for the use of the vessel from February 19, 1893, to May 19, 1893, and the said sum of $65.25 paid to the plaintiff as aforesaid.

10. Upon the whole case, the plaintiff is entitled to recover, and the referee enters judgment in favor of the plaintiff and against the defendants for the sum of $6,345.78, with interest from May 19, 1893, to March 27, 1897, being the sum of $1,467.99, and making in all the sum of $7,813.77.

Exceptions to the referee's report were dismissed by the court.

*Errors assigned* were in dismissing exceptions to referee's report.

*James Collins Jones*, with him *Lewin W. Barringer*, for appellants.—The plaintiff has no right to collect hire on the charter party in question accruing after the withdrawal of the vessel : Freights of the Kate, 63 Fed. Rep. 707 ; Campbell v. Hickok, 140 Pa. 290 ; Seanor & Bierer v. McLaughlin, 165 Pa. 150 ; Scott v. Hough, 151 Pa. 630.

Assuming that the plaintiff has no right to recover hire, qua hire, accruing after withdrawal, it has no right to recover damages accruing after withdrawal: Norrington v. Wright, 115 U. S. 188 ; In re Kelly, 51 Fed. Rep. 194.

The plaintiff, if it can recover anything, can, in no event, recover more than the difference between the unpaid hire accru-

ing after withdrawal and the cost of earning it: Nixon v. Myers, 141 Pa. 477; Emig v. Spatz, 155 Pa. 642; The Potomac, 105 U. S. 630; Oscoda, 70 Fed. Rep. 110.

*Alex. Simpson, Jr.*, for appellee.—A referee's findings of fact are equivalent to the verdict of a jury: City of Phila. v. Linnard, 97 Pa. 242.

The employment of a vessel being not merely of private advantage to the owner, but also of public benefit to the state, that construction is to be adopted which will keep the vessel "built to plough the sea, and not to lie by the walls" in employment under all circumstances: Conkling's U. S. Admiralty (2d ed.), 319; Abbott on Shipping (3d Am. ed. Story's notes) *83; Auer v. Penn, 99 Pa. 370; Reeves v. McComeskey, 168 Pa. 571; Lane v. Nelson, 167 Pa. 602; Freights of the Kate, 63 Fed. Rep. 707.

While it is true appellee can only recover the damages actually suffered, prima facie that is the amount agreed to be paid, and he who asserts that it is less must prove it: Emery v. Steckel, 126 Pa. 171; Nixon v. Myers, 141 Pa. 477; Emig v. Spatz, 155 Pa. 642; 3 Sutherland on Damages (2d ed.) sec. 882; 1 Sedgwick on Damages, sec. 227; King v. Steiren, 44 Pa. 99.

PER CURIAM, January 24, 1898:

Each of the twenty-two specifications charges error in dismissing defendants' exceptions to the learned referee's report, recited therein respectively. Some of these exceptions relate to several of the referee's findings of fact, others to his omission to find certain facts, and the others to his conclusions of law, etc.

A careful consideration of the record has failed to disclose any error therein that would justify us in sustaining either of said specifications. There is nothing in any of them that requires discussion. On the referee's findings of fact and conclusions of law, all of which were approved by the court below, we think the judgment should be affirmed.

The judgment is accordingly affirmed.